DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

UNITED STATES OF AMERICA,          )
                                   )
                Plaintiff,         )
                                   )
        v.                         )
                                   )        Criminal No. 2006-80
                                   )
GELEAN MARK, WALTER ELLS, VERNON    )
FAGAN, DORIAN SWAN, KELVIN MOSES,   )
KERRY WOODS, and CRAIG CLAXTON,     )
                                   )
                Defendants.        )
_____ )

ATTORNEYS:

**Delia L. Smith, Esq.**
**Nolan Paige, Esq.**
**Kim Lindquist, Esq.**
United States Attorneys' Office
St. Thomas, U.S.V.I.
     *For the Plaintiff,*

**Michael L. Sheesley, Esq.**
Kevin F. D'amour, P.C.
St. Thomas, U.S.V.I.
     *For defendant Vernon Fagan,*

**Carl R. Williams, Esq.**
Law Offices of Robert L. King
St. Thomas, U.S.V.I.
     *For defendant Walter Ells,*

**Michael C. Quinn, Esq.**
**Gregory H. Hodges, Esq.**
Dudley, Topper, & Feuerzeig, LLP
St. Thomas, U.S.V.I.
     *For defendant Dorian Swan,*

**Andrew L. Capdeville, Esq.**
Law Offices of Andrew L. Capdevill, P.C.
St. Thomas, U.S.V.I.
     *For defendant Kelvin Moses,*

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 2

**Darren John-Baptiste, Esq.**
The Practice, PLLC
St. Thomas, U.S.V.I.
     *For defendant Kerry Woods,*

<u>**MEMORANDUM OPINION**</u>[1]

**GÓMEZ, C.J.**

Before the Court are various post-trial motions of defendants Walter Ells ("Ells"), Kelvin Moses ("Moses"), Dorian Swan ("Swan"), Vernon Fagan ("Fagan"), and Kerry Woods ("Woods"). Ells, Moses, Swan, and Woods each move for judgments of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). Fagan joins those motions. Swan, Moses, Woods and move for a new trial, pursuant to Rule 33. Fagan and Ells join those motions. Fagan and Woods move for a new trial or dismissal based on alleged *Brady* and *Giglio* violations.

## I.   <u>FACTS</u>

On December 19, 2006, the Grand Jury returned an indictment against the defendants. Count One charged the defendants with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count Two charged Ells with conspiracy to import cocaine into the United States from Tortola, British Virgin Islands, from 1999 until October, 2005,[2] in violation of 21 U.S.C. § 952.

---

[1] To date, with the exception of Ells and Fagan, the Court has orally ruled on the motions for relief pursuant to Rules 29 and 33 for all defendants addressed in this order. For those defendants, this Memorandum Opinion and the related Order merely memorializes those oral rulings.

[2] The indictment originally charged Fagan in count two. The Court dismissed that count against Fagan on his oral Rule 29 motion, made at trial.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 3

The trial of this matter commenced on September 5, 2007. After all the evidence was presented, the jury retired to deliberate. The jury eventually informed the court that it was unable to reach a unanimous verdict as to some defendants and some counts. The Court declared a mistrial as to those matters.

The re-trial in this matter commenced on May 24, 2010. The government rested on May 28, 2010, and the defendants presented their cases.

The evidence generally showed that James Springette ("Springette") owned a cocaine growing operation in Colombia. Springette sent hundreds of kilograms of cocaine to the United States in the 1990s and 2000s. His cousin, Elton Turnbull ("Turnbull") was a high level coconspirator. Springette would send airplanes carrying cocaine from Colombia to near Tortola, British Virgin Islands. Turnbull worked with a coconspirator named Bob Hodge ("Hodge") to organize boat crews to sail from Tortola to spots where the Colombian airplanes dropped loads of cocaine. Another coconspirator named Gelean Mark ("Mark"), also known as Kirwin, was responsible for getting the cocaine from Tortola to St. Thomas, by boat. Some of the cocaine was then distributed in St. Thomas. Mark was also responsible for secreting the rest of the cocaine onto commercial airplanes originating in St. Thomas and flying to various east coast cities. Glenson Isaac ("Isaac") was the co-conspirator stationed on the east coast who organized returning the cash proceeds from the sale of cocaine to Mark in St. Thomas. He usually used female cash couriers

who would fly to St. Thomas with carry-on luggage carrying hundreds of thousands of dollars in cash.    Henry Freeman ("Freeman") another coconspirator, was primarily responsible for organizing the pick up of the cash couriers in St. Thomas, although other members of the organization helped with this job from time to time.

The jury commenced deliberations on May 30, 2010. On May 31, 2010, the jury returned verdicts finding each of the defendants guilty of each count.

## II.  DISCUSSION

### A. Rule 29

A defendant "challenging the sufficiency of the evidence bears a heavy burden." *United States v. Casper*, 956 F.2d 416, 421 (3d Cir. 1992). A judgment of acquittal is appropriate under Rule 29 only if, after reviewing the record in a light most favorable to the prosecution, the Court determines that no rational jury could find proof of guilt beyond a reasonable doubt. *United States v. Bobb*, 471 F.3d 491, 494 (3d Cir. 2006); *see also United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)).

An insufficiency finding should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 5

be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted); *see also United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984) ("Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible.").

Further, the government may sustain its burden entirely through circumstantial evidence. *Bobb*, 471 F.3d at 494; *see also United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988).

## B. Rule 33

When deciding a Rule 33 motion for a new trial, the Court is provided somewhat more discretion than what is afforded under Rule 29. Under Rule 33, the Court may grant a new trial "in the interest of justice." *United States v. Charles*, 949 F. Supp. 365, 368, 35 V.I. 306 (D.V.I. 1996). In assessing such "interest", the court may weigh the evidence and credibility of witnesses. *United States v. Bevans*, 728 F. Supp. 340, 343 (E.D. Pa. 1990), *aff'd*, 914 F.2d 244 (3d Cir. 1990). If the Court determines that there has been a miscarriage of justice, the court may order a new trial. *Id*. "The burden is on the defendant to show that a new trial ought to be granted. Any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial." *United States v. Clovis*, Crim. No. 94-11, 1996 U.S. Dist. LEXIS 20808, at *5 (D.V.I. Feb. 12, 1996).

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 6

### III. <u>ANALYSIS</u>

**A. Rule 29**

The indictment alleged two different conspiracies: Count One alleges a conspiracy to possess with intent to distribute cocaine alleged, and Count Two alleges a conspiracy to import cocaine alleged in Count Two.

To sustain its burden of proof on a conspiracy charge, the government must show: "(1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal." *United States v. Pressler,* 256 F.3d 144, 147 (3d Cir. 2001). The government must prove "that [the] defendant entered into an agreement and knew that the agreement had the specific unlawful purpose charged in the indictment." *United States v. Idowu*, 157 F.3d 265, 266-67 (3d Cir. 1998)(citation and internal quotation marks omitted); *see also United States v. Cartwright,* 359 F.3d 281, 286-87 (3d Cir. 2004).

The essence of any conspiracy is the agreement. *Pressler,* 256 F.3d at 147. Because agreements to commit crimes are clandestine by nature, direct evidence of criminal conspiracies is rare. *See id.* "The elements of a conspiracy may be proven entirely by circumstantial evidence, but each element of the offense must be proved beyond a reasonable doubt." *United States v. Wexler*, 838 F.2d 88, 90 (3d Cir. 1988). "Inferences from established facts are accepted methods of proof when no direct evidence is available so long as there exists a logical and convincing connection between the facts established and

the conclusion inferred." *Idowu,* 157 F.3d at 269 (citation and quotations omitted). For example, a rational jury may find a conspiracy where the alleged co-conspirators: demonstrated a level of mutual trust, referred business to one another in exchange for discounts, frequently met to exchange large sums of money, consulted each other about drug prices, conducted their business in code, stood on lookout for each other, provided protection to one another, shared packaging materials, shared profits, or acted as debtor or creditor to one another. *See Pressler,* 256 F.3d at 153-54; *United States v. Gibbs*, 190 F.3d 188, 200-02 (3d Cir. 1999); *United States v. Powell,* 113 F.3d 464, 467 (3d Cir. 1997); *United States v. McGlory,* 968 F.2d 309, 322-28 (3d Cir. 1992).

Viewing the evidence in the light most favorable to the government, the Court must determine whether any rational jury could find beyond a reasonable doubt that the elements of a conspiracy have been satisfied with respect to the defendants.

## 1.    Ells

At trial, the government presented the testimony of Glenson Isaac ("Isaac"), a member of an organization led by James Springette ("Springette") that trafficked cocaine from South America through Tortola, British Virgin Islands, to St. Thomas, U.S. Virgin Islands, and on to the east coast of the United States during the period from 1999 through 2005. Isaac grew up with Ells and several of the other defendants in St. Thomas.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 8

Isaac described a May 2005 trip he took with Gelean Mark ("Mark")

from St. Thomas to Tortola, British Virgin Islands, on a boat operated

by Ells. Mark was described throughout the course of the trial as the

coconspirator who organized the portion of the cocaine's transit by

boat from Tortola to St. Thomas, then on to various east coast cities

by plane.

After docking the vessel at a marina in Tortola, Isaac and Ells

ate lunch at a restaurant owned by another member of the conspiracy,

Bob Hodge ("Hodge"). During lunch, Ells received a phone call from

Mark, who asked to speak to Isaac. Ells passed the phone to Isaac.

At trial, the prosecutor asked Isaac about his conversation with Mark.

> A. Well, he called -- Mr. Mark called Walter Ells and
> tell Walter Ells that he want to talk to me.
>
> Q. And did you, in fact, speak with Mr. Mark?
> A. Yes.
>
> Q. What, if anything, did you talk about?
>
> A. He just say something brief to me, saying that we
> going be traveling back dirty, if I'm up for it.
>
> Q. What did that mean to you, "traveling dirty"?
>
> A. Going back with drugs.
>
> Q. And what, if anything, did you say?
>
> A. Told him don't ask me no silly question.

(Trial Tr. 70.)

After lunch, Isaac and Ells met Mark and Hodge at the Marina where

they had docked the boat. Ells was present as Hodge handed Mark a black

plastic bag, which Mark put on the boat. Isaac stated at trial that

he knew the bag contained drugs because Mark had told him so.

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 9

Ells drove the boat back to St. Thomas. Isaac testified that Ells's role was that he "just sail the vessel." (*Id.* at 68.) They traveled quickly, in order to avoid detection by law enforcement. Everyone on the boat looked out for lights that could indicate a law enforcement boat approaching. For the duration of the trip, Mark held the bag over the side of the boat and out of the water. Isaac testified that Mark held the bag that way so he could get rid of the bag by releasing it overboard if they saw the police. Isaac also testified that he listened to conversation between Mark and Ells on the ride back to St. Thomas, which consisted mostly of arguing about navigation.

Isaac also testified that Mark called Fagan during the trip back to St. Thomas. When Mark, Ells, and Isaac returned to St. Thomas, they met Fagan at a dock near Coki Point. Mark handed Fagan the black plastic bag, and Fagan took off.

In addition to Isaac's testimony, the government introduced audio recordings of phone calls the agents intercepted through wiretaps. On the afternoon of June 7, 2005, at 4:57 p.m., during a phone call between Mark and Fagan, Mark stated:

> And it look like the same fuck around dude he fuck with you
> know what I mean. Cause is the same fuck Ookie telling me.

(Ex. 19B, 19C.) Other testimony at trial had identified Ookie as Ells's nickname. Later that night, at 8:59 p.m. Ells called Fagan and told him:

> ELLS: I safe. Yeah, yeah. I safe, I safe.
>
> FAGAN: Alright.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 10

(Ex. 22B, 22C.) Two minutes later, Mark called Fagan and asked

him:

       MARK: How much is it?

       FAGAN: Three.

       MARK: Alright. . . .

       . . .

       FAGAN: Its now I want from you again. I want, ahm, Partner
       number.

       MARK: For Century?

       FAGAN: No, ahm, he tell me he just reach already, you know.
       I talking about, ahm. . . . Hello, you could hear me?

(Ex.23B, 23C.)  Detective Mark Joseph ("Joseph") of the Virgin

Islands Police Department and DEA Special Agent testified that he had

identified Ells as "Century" early in his investigation.

       On July 27, 2005, the government intercepted several

conversations between Mark and Ells.

       At 3:09 p.m. the following conversation took place:

WE: So what about your thing?

GM: I don't know? I guess . . . I guess you could walk with
it, man . . . I'll see if he out there.

WE: So where I coming?

GM: Ahm . . . By Robbie them.

WE: Okay. So when I reach west call you?

GM: Yeah. But, ahm. . . give me a little time let me try
find him.

WE: Okay.

GM: Alright

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 11

(Ex. 36B, 36C.)

The government played another intercepted phone call that it alleged took place at the same exact time between the same people, Ells and Mark.

WE: Hello

GM: Yo

WE: yeah.

GM: Yeah. That thing were were [sic] talking about, I going leave it, man. I find partner, but I got a . . ., I got a bad feeling man.

WE: okay.

GM: So, ahm . . . But I going call you when I, when I on my way out there.

WE: Oh, tell Louie that the partner say the place available or some shit by he or some shit like that there. Earl, Earl, Earl, Earl, the dude name Earl.

GM: oh, cause me ain't fine him at all you know.

WE: Ok, well the dude name Earl.

GM: Who somebody was coming up or something?

WE: Coming up way? Naw, I guess Louis was just asking him about a place to stay. He was saying the place down by he empty or something and he tell me he and Louie talk, so Louie suppose to know what he talking about.

GM: Oh, ok ok ok. Alright.

WE: Yeah, ok.

(Ex. 37B, 37C.)

On July 27, 2005 at 8:01 p.m., Mark and Ells had the following conversation:

WE: Hello

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 12

GM: yea

WE: you can hear me

GM: yea, yea

WE: Hello

GM: Yea, yeah

WE: When you coming

GM: I here down by them man still

WE: alright

GM: But don't forget that we leave that

WE: call me when you all are coming

WE: A

GM: We are going to leave that there until another day don't forget

WE: I didn't hear you, you know

GM: Where you are, home

WE: Oh, oh, oh we saving until another day yea

GM: You still home

WE: yea, yeah

(Ex. 38B, 38C.)

At 5:14 p.m. on July 30, 2010, Ells and Mark again spoke, and the following conversation was recorded:

GM: Yeah

WE: The number is 643-1302.

GM: Alright, well is best if we got, we got to pick he up, is best you come Red Hook, man. Where you rather come?

WE: I going come Red Hook.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 13

>  GM: Alright.
>
>  WE: I going come in the Power Play.
>
>  GM: Yeah, yeah, yeah. Alright.
>
>  WE: Alright.

(EX. 39B, 39C.).

Isaac also testified about the structure of the organization bringing drugs from Tortola into St. Thomas, during a period beginning in 2003 and ending in 2005. When questioned about the members of the organization, Isaac testified in reference to a diagram outlining the British Virgin Islands segment of operations:

>  A: That's the British Virgin Islands where the drugs are stored. Ookie is the boat handler.
>
>  Q: What other name, if any, is Ookie referred as--what other name do you know him as?
>
>  A. Walter Ells.

(Trial Tr. 89.)

The evidence presented at trial was sufficient for a rational jury to infer that Ells was engaged in some kind of illicit behavior. Ells was navigating a boat that clearly was involved in trafficking contraband. Further, it is clear that Ells regularly kept company with other members of the conspiracy.

However, it is well-settled that "even in situations where the defendant knew that he was engaged in illicit activity, and knew that 'some form of contraband' was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 14

objective contemplated by the conspiracy." *Idowu,* 157 F.3d at 266-67.

Knowledge of the object of a conspiracy may be established from

inferences based on circumstantial evidence, but a conspiracy

conviction may not be sustained by "inference as to the defendant's

knowledge based upon speculation." *Cartwright*, 359 F.3d at 287-88.

The Third Circuit "has consistently overturned convictions for

conspiracy in drug possession and distribution because of the absence

of any evidence that the defendant had knowledge that drugs were

involved." *Cartwright,* 359 F.3d at 287 (quoting *United States v.*

*Mastrangelo,* 172 F.3d 288, 293 (3d Cir. 1999)).

In *United States v. Wexler,* 838 F.2d 88 (3d Cir. 1988), the

defendant drove in a manner suggesting he was acting as a "lookout"

for a truck containing drugs, spoke to a co-conspirator several times

during the transaction, and signaled to a co-conspirator during the

transaction. 838 F.3d at 91. Additionally, the police found a CB radio

purchased using a false name in the car the defendant was driving.

*Id*. That evidence was insufficient to show that the defendant knew

that the transaction involved controlled substances. As the Third

Circuit explained,

> It is likely that [the co-conspirator] would associate in
> the scheme only with persons he believed would not go to
> the police. It is also more likely than not that [the
> defendant] suspected, if not actually knew, that some form
> of contraband was involved in the elaborate secretive
> arrangements for transport in which he participated. But
> these permissible inferences do not support a holding that
> the government met its burden to prove beyond a reasonable
> doubt that [the defendant] knew this was a conspiracy to
> transport hashish or even another controlled substance.
> The evidence is just as consistent, for example, with a

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 15

        conspiracy to transport stolen goods, an entirely
        different crime.

*Wexler,* 838 F.2d at 92.

      In *United States v. Salmon,* 944 F.2d 1106 (3d Cir. 1991), the

defendant drove his car to the scene of a drug transaction with other

co-conspirators, performed surveillance, and spoke to

co-conspirators during a drug transaction. 944 F.2d at 1114. He also

opened the trunk of the car in the parking lot where the drug deal

occurred, and a co-conspirator walked to the trunk area before

performing the transaction. *Id.* The Third Circuit held that the above

evidence was insufficient to prove that the defendant had the specific

knowledge required to support a conspiracy conviction. *Id* at 1115.

The court reasoned that, "even assuming, *arguendo*, that the cocaine

was in the trunk, the record contains no evidence that [the defendant]

knew that the bag contained a controlled substance such as cocaine

as opposed to anything else." Id.

      In *United States v. Idowu,* 157 F.3d 265 (3d Cir. 1998), the

defendant, Ismoila Idowu ("Idowu"), was convicted of conspiracy to

possess with intent to distribute more than one kilogram of heroin.

      The arrest of Idowu came about as part of a DEA operation. DEA

agents in Pakistan seized heroin during an operation there. The DEA

used the seized heroin as well as an informant, Abdul Khaliq

("Khaliq") to conduct a sting operation to access United States heroin

purchasers. Thereafter, Khaliq received a phone call orchestrated by

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 16

another DEA officer, from a man referred to as "Raja" who told Khaliq

that someone would call him to make plans for the purchase of heroin.

Khaliq received a call from Idowu's codefendant Monadu Ajao

("Ajao"). Thereafter, Ajao negotiated the purchase of heroin with

Ajao in a series of telephone calls, which were recorded by the DEA.

"Throughout the telephone negotiations, Ajao never mentioned Idowu,

nor did he specifically mention heroin." 157 F.3d at 266. They settled

on meeting at a Quality Inn parking lot.

The DEA agents arranged to survey the Quality Inn meeting, and

outfitted Khaliq with a concealed tape recorder and transmitter. Ajao

arrived at the Quality Inn in a black Lincoln Town Car, which Idowu

was driving. Ajao and Idowu exited the car and went into the Quality

Inn lobby. Idowu carried a brown leather bag.

Thereafter, Ajao and Idowu exited the lobby, got back in the

sedan, and drove it to another location in the parking lot.

Khaliq arrived at Quality Inn in a Ford Explorer with a black

suitcase in the trunk. That suitcase was designed to secure drugs in

its lining.

Ajao exited the sedan and approached Khaliq, while Idowu

remained in the car. Ajao and Khaliq spoke about the purchase price,

which had been set at $30,000. Ajao informed Khaliq he had only brought

$20,000.

Ajao and Khaliq then advanced to the sedan. Ajao invited Khaliq

to get into the car. Khaliq declined. Ajao sitting in the front seat,

carried on speaking to Khaliq, who stood outside the car.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 17

Ajao and Idowu then got out of the Town Car. Khaliq encountered
Idowu for the first time. When Khaliq inquired as to who Idowu was,
Ajao responded "he is the driver."

The men all convened near the trunk of the Town Car. Idowu opened
the trunk, and inside was the brown leather bag. Idowu then opened
the bag, showing Khaliq the money inside. As Khaliq counted the money,
he informed the men he would need to take the bag with him. Idowu
commented that he had some documents in the bag, and also noted he
wanted to get the bag back. Khaliq said Idowu could take out the
documents, and that Khaliq would return the bag to Idowu the following
day. Idowu noted that "he had checked the money himself, and that all
$20,000 was there." *Idowu*, 157 F.3d at 267.

Khaliq took the brown leather bag to his Ford and opened the rear
hatch. Idowu had previously moved the sedan to the spot adjacent to
the Ford, then took the specially-designed black suitcase out of
Khaliq's car and placed it into the still-open trunk of the sedan.
Idowu opened the black suitcase and observing nothing inside, told
Ajao, "They didn't pack this thing."  Ajao told Idowu to push the
suitcase with his hands, and Khaliq attempted to convince the men that
something was hidden in the suitcase frame.

Shortly thereafter, the DEA arrested Ajao and Idowu. They
discovered $3,495 on Idowu's person, and $18,000 inside the brown
leather bag.

Based on that evidence, the Third Circuit concluded that "only
two inferences are proper: that [the defendant] had some kind of

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 18

preexisting relationship with [the co-conspirator], and that [the defendant] knew he was participating in some sort of illegal transaction." *Id.* The evidence failed to support the critical inference that the defendant "knew the transaction was a drug transaction." *Id.* The court reasoned that none of the participants referred to the subject of the transaction as "heroin" or "drugs" in the defendant's presence, but rather referred to "the stuff." *Id.* Additionally, the defendant did not take part in any of the recorded telephone conversations leading up to the transaction in question. *Id.* Accordingly, the court held that "it [wa]s unreasonable for a jury to infer that [the defendant] knew of the transaction's ultimate purpose." *Id.* at 269.

In *United States v. Rodriquez-Valdez*, 209 Fed. App'x 178 (3d Cir. 2006), the defendant was present on a boat that was linked to a second vessel on which 498.5 kilograms of cocaine was found. 209 Fed. App'x at 179. He was charged with conspiracy to possess with intent to distribute cocaine. During the trial, a cooperating witness testified that he had participated in an operation to smuggle drugs from St. Maarten to St. Thomas using the seized vessels. The cooperating witness noted that prior to the transport of the drugs, he stayed in a hotel in St. Thomas, and met with several of the participants in the drug smuggling effort. The cooperating witness stated that Valdez was "'a constant help,'" but, "there was no testimony from [the cooperating witness] or law enforcement authorities that drugs were ever discussed while Valdez was present at the hotel, or that he spent

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 19

much time at the hotel during [the cooperating witness'] ten-day stay." *Id.* at 180-81.

The Third Circuit found that there was insufficient evidence that Valdez was necessarily exposed to the object of the conspiracy during this time. It reasoned that, though Valdez's presence on the boat may have been suggestive of knowledge of illicit activity, his presence "[wa]s . . . too slender a reed upon which to base a finding that he was aware of the object of the conspiracy." *Id.* at 181.

This line of cases stands for the proposition that the government must not merely offer proof of knowledge in the ballpark of the object of the conspiracy. Behaving in a manner consistent with realizing a criminal design is not sufficient. Indeed, the Third Circuit has stated that "[t]he inferences rising from 'keeping bad company' are not enough to convict a defendant for conspiracy." *See Wexler,* 838 F.2d at 91 (quoting *United States v. Cooper,* 567 F.2d 252, 255 (3d Cir. 1977)). In *United States v. Davis*, 458 F. App'x 152 (3d Cir. 2012), the Third Circuit considered a defendant's conviction of conspiracy to possess a firearm by a previously convicted felon or conspiracy to possess a stolen firearm. The evidence against the defendant Shawn Davis ("Davis") consisted primarily of the testimony of his codefendants and alleged coconspirators, Eric Seigler ("Seigler") and Delontay Barnes ("Barnes"). Seigler testified that he asked Davis to give him a ride to a friend's house. *Id.* at 155. Seigler stated that "the purpose of the ride was to take [Seigler] to his friend's house so that he could drop off his .38 revolver there

but he did not testify that Davis knew that he had that objective." *Id.* Seigler explained that he carried the gun in the waistband of his trousers and it was not visible to Davis because his shirt covered it. *Id.* Once he realized the car was being pulled over, Seigler placed the gun on the floor. *Id.* "Seigler also testified that he did not tell Davis he was carrying a gun and that there was no conversation in the vehicle regarding his gun." *Id.*

The Government argued "if the jury believed Seigler's testimony that Davis was giving Barnes and Seigler a ride so that Seigler could drop off his gun at his friend's house, it could have inferred that Davis knew of the purpose of the ride." *Id.* From that inference, the jury could have further inferred Davis conspired with Seigler to possess the gun. While the court acknowledged that the jury could have reasonably made the first inference, it found the evidence inadequate to support the second. There was "no evidence that Davis facilitated Seigler's possession of the gun or any other proof showing a unity of purpose or a common goal . . . ." *Id.* The court expressly "reject[ed] any contention that a showing that a person is driving someone who the driver knows is carrying a gun in itself establishes that there was a conspiracy between the driver and the passenger to possess the gun." *Id.*

In *Wexler*, *Salmon*, and *Idowu*, the primary evidence against the defendants consisted of suspicious conduct on the part of the defendants with coconspirators, where the coconspirators were knowledgeable about drugs; and record evidence of statements made by

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 21

the defendants, which on their face appear inculpatory. Indeed, in

*Idowu*, in addition to evidence that the defendant was "the driver,"

the defendant also referred to "the stuff"--although the defendant

did not explicitly mention drugs--and the defendant bragged about his

diligence in verifying that all the money for the transaction was in

the bag. Idowu also retrieved the suitcase that was supposed to

contain the "stuff" and checked for the "stuff."

By contrast, in more recent cases from this circuit,

coconspirator testimony has figured prominently in proving the

defendant's knowledge. *See, e.g., United States v. Boria*, 592 F.3d

476 (3d Cir. 2010); *United States v. Reyeros*, 537 F.3d 270 (3d Cir.

2008). The government attempts to draw comparisons to the evidence

found sufficient in *United States v. Reyeros*, 537 F.3d 270 (3d Cir.

2008). There, the Third Circuit addressed a sufficiency of the

evidence challenge from a defendant, Jorge Reyeros, a former

inspector for the United States Customs Service, who had been

convicted of conspiring to import cocaine. Reyeros argued that the

government did not adequately prove that he knew the specific aim of

the conspiracy was to import cocaine. The government offered the

testimony of alleged co-conspirator Hernan Uribe. Uribe testified

that at a meeting among the co-conspirators, Jorge's brother, Juan,

was adamant about the amount of cocaine that needed to be imported.

Uribe noted that Juan told him "'many, many times that Jorge needed

that quantity-Jorge Reyeros, his brother, needed that quantity. He

wouldn't work with other quantities. . . .'" 537 F.3d at 279. Uribe

CASE: 3:06-cr-00080-CVG-RM   Document #: 1370   Filed: 07/10/12   Page 22 of 60



United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 22

further testified that he understood Juan to mean that Jorge would not use his Customs position for drug transactions that were not appropriately significant. *Id.* The Third Circuit concluded that Uribe's testimony provided a sufficient basis to conclude that Jorge knew that the object of the conspiracy was to import cocaine. *Id.*

The tapes of Ells's co-conspirators here do not offer such incriminating evidence. When Mark and Fagan discussed Ookie, Ells's alias, they did not discuss any conditions for his captaining a boat for them that would suggest his awareness of the conspiracy's aim. Further, no conspirator or other witness deciphered or interpreted the disjointed and at times convoluted conversations in which Ells took part as "drug" calls.

Although Ells was present during the cellular phone conversation about "riding dirty" back to St. Thomas, he did not participate in the conversation, and could only hear Isaac's end of the conversation. Nothing Isaac said out loud in Ells's presence during that phone call indicated that the nature of the trip would be to transport a controlled substance. All Isaac said that Ells could hear was that Mark should not ask Isaac any silly questions. Ells never handled the bag in May, 2005, nor is there any evidence that he ever exercised dominion and control over any controlled substance at any time. Further, Isaac testified that once Mark received the bag from Hodge in Tortola, the bag was never opened, but remained tied closed, through the time it was handed off to Fagan at Coki point.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 23

The government further relies on *United States v. Boria*, 592 F.3d 476 (3d Cir. 2010). There, a DEA informant, Jose Alvarado, received a phone call from Miguel Morel, with whom he had previous experience working to transport drugs. Morel was traveling in a truck with his associate Marcus Diaz, and called Alvarado seeking help locating a garage where Morel could park a tractor-trailer for unloading. Alvarado did not provide a garage, but helped Morel secure an overnight parking location.

The next morning, Morel called Alvarado and told him that he had dispatched someone to move the tractor-trailer to a garage for unloading. Morel specified that this person would identify himself as "Ruben."

Boria arrived in the parking lot and proceeded to the tractor-trailer. When Diaz asked his identity, Boria responded "Ruben." Diaz then got in the driver's side of the truck, and Boria got in the passenger's side. The truck departed, with Alvarado following in a car behind.

Thereafter, the men stopped in a K-Mart parking lot. Alvarado got out of his car and approached the truck, wanting to ask why they had elected to stop in a "hot area." Boria was on the phone at the time Alvarado arrived at the tractor. When Boria was off the phone, Alvarado inquired where the truck was going. Boria answered that they were en route to a garage in North Philadelphia.

The truck then left the parking lot. As the truck was heading out of the lot, it was stopped by the police. The police undertook

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 24

a lawful search and uncovered one hundred kilograms of cocaine in hidden boxes in the trailer.

The district court ruled that there was insufficient evidence to support a conviction of Boria for conspiracy to possess with intent to distribute cocaine, highlighting a lack of evidence regarding Boria's knowledge of the object of the conspiracy.

Considering the sufficiency of the evidence on appeal, the Third Circuit distinguished *Boria* from the *Wexler-Cartwright-Idowu* line of cases. The Third Circuit emphasized "Alvarado's testimony that Boria's role was to 'take [the tractor-trailer] to a garage to unload the drugs that were in the back of the tractor trailer.'" 592 F.3d at 485. Alvarado further noted that Boria bore responsibility for "'tak[ing] the driver of the tractor-trailer to finish off what needs to be done inside the truck.'" *Id.* The Third Circuit concluded that "this co-conspirator testimony imputes to Boria knowledge that the tractor-trailer he was assigned to direct to a garage contained drugs, which is the additional fact necessary to support the jury's guilty verdict." *Id.* The *Boria* court noted that "the cases in which we declined to find sufficient evidence did not include such evidence, and we find its presence in this case decisive." *Id.* (citing *Reyeros*, 537 F.3d at 279).

The Third Circuit has further expounded on the *Boria-Reyeros* line of authority in a recent decision involving one of the coconspirators in this case, *United States v. Claxton*, No. 11-2552 (3d Cir. July 9, 2012) (slip op.). At trial, Isaac stated that Claxton

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 25

was a "member of the organization." The Third Circuit noted that,

unlike in *Boria*, this statement was not the admission of a

coconspirator made during the course of a conspiracy, but rather an

"admitted-conspirator's trial testimony regarding who was or was not

his coconspirator . . . ." *Id.* at 20. Thus, Isaac's testimony, while

still "highly pertinent to the question of the defendant's knowing

complicity in the crime," was not as probative as a statement made

by a coconspirator during and in furtherance of the conspiracy. *Id.*

However, the Third Circuit found that Isaac's statement was "strong

circumstantial evidence of Claxton's knowing involvement in [the]

drug conspiracy." *Id.* at 21. The Third Circuit explained:

> [T]he fact that Claxton was identified as a member of a
> drug-trafficking organization by an admitted-conspirator,
> that he repeatedly did that organization's bidding, that
> he was entrusted to help transport large sums of money, that
> he visited the place where that money was laundered, and
> that he frequented the place where the organization's drugs
> were stored and its business discussed all strongly suggest
> that he was aware of his role in the conspiracy for which
> he was prosecuted.

*Id.* at 27-28.

In reconciling the *Idowu-Cartwright* line of cases with the *Boria*

line of cases, it is clear that a conspirator's statement may be given

great weight when it directly imputes knowledge of a drug trafficking

objective to a defendant. It is also clear that any conclusory

statement or mention by a co-conspirator that a defendant is involved

in criminal conduct--such as a naked statement that a defendant is

a coconspirator or a "driver," *see Idowu*, 157 F.3d at 269--even when

coupled with keeping bad company and engaging in suspicious

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 26

conduct--cannot serve as a basis to impute knowledge of the object of the conspiracy.[3]

Here, Isaac simply testified that Ells was a "boathandler" who "sail[ed] the vessel." That is, Isaac identified Ells as someone who performed a certain task. Isaac did not state that Ells was aware of the nature of his cargo or the ultimate object of the conspiracy.

Although the circumstances here may appear to resemble those in *Boria*, they are distinguishable. In *Boria*, the Third Circuit observed that a coconspirator testified that the defendant "*Boria's role was to . . . unload drugs . . . .*" 592 F.3d at 485 (emphasis supplied). Similarly, in *Reyeros*, coconspirators indicated that the *defendant* in that case *needed a certain quantity of cocaine*. 537 F.3d at 279. In those cases, the Third Circuit has accorded great weight to coconspirator testimony that directly imputes knowledge to the defendant of the object of the conspiracy. That is, there was direct evidence, usually in the form of unambiguous testimony of a *drug-related* undertaking by the defendant .

The Court has found no such evidence that directly imputes knowledge to Ells here. Significantly, Isaac's testimony, unlike that of the coconspirators in *Boria* and *Reyeros*, did not directly impute knowledge of the drug-trafficking object of the conspiracy to Ells. Isaac's statements identify a task undertaken by Ells. Isaac never

---

[3] Here, the Court distinguishes direct evidence of a drug undertaking--such as "unloading drugs" in *Boria*; demanding a quantity of drugs in *Reyeros*--from evidence of suspicious conduct, such as being a driver without reference to drugs, as in *Cartwright*, *Idowu*, and *Cooper*.

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 27

described Ells as a "member of the organization." Moreover, Isaac

testified in detail only about one trip involving Ells serving as the

"boathandler." While this trip may have involved drugs, Ells was not

a party to any of the discussions about "riding dirty" and did not

directly handle the transfer, in the way that Claxton personally and,

on some occasions, solely, conducted the transfers of cash. Thus,

unlike his testimony about Claxton, Isaac's testimony about Ells was

not supported by any other evidence that suggests Ells was more than

a "boathandler" or that Ells was truly a "member of the organization."

The Court has found no decision sustaining a conspiracy

conviction predicated upon coconspirator testimony which merely

identifies a task undertaken by the defendant. Isaac's statements

about Ells, even when coupled with the phone calls and suspicious

conduct, do not provide a sufficient basis for a jury to have

permissibly inferred that Ells had the requisite knowledge of a

drug-trafficking objective of the conspiracy. The remaining

permissible inferences are simply "too slim a reed upon which to hang

a criminal conspiracy conviction." *United States v. Tyson*, 653 F.3d

192, 210 (3d Cir. 2011).[4]

---

[4] Indeed, if conspirators decided to transport drugs on the public ferries
that often run between Tortola and St. Thomas, a coconspirator in Isaac's position
could testify that the captain of the public ferry was the "boathandler" and that
his job was to "sail the vessel," all of which is technically true. The
coconspirator's testimony, if given the overwhelming weight the Government urges
it ought to have, would seem to impute a role in the conspiracy and knowledge of
its ultimate objective to the public ferry captain simply by describing the duties
he ordinarily performs as part of his regular job. If the captain had made phone
calls and kept company with any conspirators, his boat would be all but sunk.
Thus, his associations and the description of his duties would impute knowledge
of the ultimate objective of a drug conspiracy, without any direct reference to
drugs. *Idowu*, *Cooper*, *Rodriguez-Valdez*, *Cartwright*, *Wexler*, and *Salmon* seem to
counsel a different result.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 28

For the foregoing reasons, the Court will grant Ells's motion for a judgment of acquittal as to both counts on which he was convicted.

### 2.   Moses

Moses also moves for a judgment of acquittal, claiming that there was insufficient evidence for a rational juror to find that he had conspired to possess with intent to distribute cocaine, as charged in Count One.

During the trial, Isaac testified that Mark had told him that Moses owned a cleaning business with Mark. Isaac testified that Mark had said that Moses and Mark did not care if they turned a profit, that the business was simply used to launder drug proceeds.

Isaac also said that in August of 2005, he spoke to Moses and asked Moses to pick up one of the female couriers Isaac used to carry drug proceeds back to St. Thomas. Alexis Wright ("Wright") testified at trial that she flew to St. Thomas on behalf of Isaac several times carrying a bag that Isaac packed for her. In September, 2005, she took such a trip and at trial she identified Moses as the individual who picked her up from the airport and took her to have lunch. Moses paid Wright $1000 at that time.

Another cash courier named Valencia Roberts ("Roberts") also identified Moses as the person who picked her up from the airport in St. Thomas in September, 2005. Roberts had traveled to St. Thomas at the direction of Isaac and had transported a green bag he had given her. Moses dropped off Roberts at her hotel room and left with the

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 29

green bag. Hours later, Moses returned to the hotel room and gave Roberts the green bag, her clothes, and $1,000 cash. The next day, Moses took Roberts to the airport and she flew back to North Carolina.

Isaac identified Moses as a "mule" or courier for the organization. In September of 2005, according to Isaac, Mark told Isaac that Mark was sending 10 kilos of cocaine and a champion dog to Isaac in North Carolina. Isaac sent his drug selling "partner" Everette Mills ("Mills") and a friend named Mia Moore ("Moore"), in Isaac's truck, to the Charlotte airport to pick up Moses. Mills and Moore brought Moses back to Isaac. When they met up, Isaac paid Moses $5000. The government presented an airline itinerary that Isaac said Moses left in his truck on that occasion. (Ex. 6B.)  The itinerary showed a US Air flight from St. Thomas to Charlotte on September 19, 2005, returning on September 26, 2005.

Isaac also testified that on at least 10 occasions he visited a place called "the farm" on St. Thomas. The farm was used by members of the conspiracy for raising fighting dogs and chickens, and also as a place for drug business discussions. He also testified to seeing many of the defendants, including Moses, at the farm, and on other visits to St. Thomas. Isaac identified Moses as a member of the organization that was smuggling drugs from Tortola to the east coast of the United States.

The evidence adduced at trial shows ongoing participation by Moses in drug trafficking activities of Isaac and Mark. Moses' awareness of his participation in a larger organization and his

knowledge of the organization's drug trafficking objectives are evidenced by the facts that he took drugs from St. Thomas to North Carolina, and helped handle the cash couriers who returned the proceeds from North Carolina to St. Thomas. A rational jury granting every inference in favor of the government could find that Moses agreed to participate in the conspiracy alleged in Count One based on the testimony of Isaac, Wright, and Roberts. *See, e.g., United States v. Price*, 13 F.3d 711, 731 (3d Cir. 1994) (finding that the evidence supported the inference that the defendant agreed to participate in a conspiracy where, a co-conspirator testified as to the defendant's involvement in the conspiracy, which was confirmed by a recorded conversation, and other evidence). Accordingly, the Court will deny Moses' motion for a judgment of acquittal.

### 3.    Swan

In relation to Swan, the government offered the testimony of Elton Turnbull ("Turnbull"), a cooperating witness. Turnbull identified Swan in court. Turnbull also said that at one point he received a load of 9 kilos of Mark's cocaine from Swan. In discussing different ways the conspiracy would get cocaine into the United States, Turnbull testified that the St. Croix, Virgin Islands, to Philadelphia and/or Baltimore route was Swan's. He testified that on three or four occasions, he received 10 kilogram loads of cocaine from Swan.

Turnbull also testified that in 2002 Swan wanted to cut him out of the drug transactions, meaning that Swan wanted to deal directly with Mark.

Additionally, portions of Isaac's trial testimony related to Swan. Isaac explained that he had been in prison and was released in 2002. In 2003, he wanted to "get back on his feet" by engaging in high level cocaine dealing. Isaac said he spoke to Mark about this, and later Mark told him to meet someone in New York. Isaac said he went to the Bronx, and met with Swan. Swan gave Isaac a half a kilo of cocaine, which Isaac picked up out of the back of Swan's car.

Isaac also testified that in June of 2003, he got an order from Mark to go get more cocaine from Swan. Isaac said he was supposed to receive 4 kilos of cocaine, but when he got the package from Swan's car, it only contained 2 kilos. Isaac contacted Mark about the shortfall and Mark said he would talk to Swan to figure out "what was going on." Isaac said on both occasions, he sold the cocaine he received from Swan, and returned the profits to Mark in St. Thomas, while keeping his share of the proceeds.

In relating his visits to "the farm ," Isaac also testified that he had seen Swan there.

In addition, a convicted cocaine dealer named Christopher Swaney ("Swaney") testified. Swaney said he did some cocaine deals, brokered by Isaac, with people in the Virgin Islands in 2004. Swaney met Swan through Swaney's cocaine dealing "partner" Rodney Williamson

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 32

("Williamson") in 2004, at a dog fight in Greensborough, North
Carolina.

Swaney also testified that Swan sold him 20 kilos of cocaine.
At the time of that transaction, Swaney could not find Swan's location
in New York, so he called Swan. Swan guided Swaney to the location
in New York, over the phone. Swaney picked up the 20 kilos, but did
not pay Swan at that time because Swan had already been paid.

In addition, Swaney said that Swan explained his drug routes and
procedures to Swaney. Swaney testified that Swan said that he
controlled the route through which cocaine traveled to the United
States from St. Thomas, and that he had a contact at the airport that
allowed for a bag switch to get cocaine onto the airplanes. Swaney
said that Swan also explained how the proceeds got back to St. Thomas
in heat sealed bags, wrapped in towels, inside couriers' luggage.

Glenson Isaac's brother Kevon Issac ("Kevon") testified about
Swan's drug activity as well. Kevon testified that he saw drugs
delivered to Swan's apartment in Baltimore on several occasions
between 1999 and 2000. Kevon also testified to seeing over $200,000
in the same apartment, which he said was going to be sent to a "guy
named Kerwin."  Other testimony at trial showed that Mark's nickname
was Kerwin. Kevon's testimony painted a picture of Swan not only
receiving large quantities of cocaine, but also sending the proceeds
back to Mark. This evidence, especially when taken together with
Glenson Isaac's, supported the inference that Swan acted as a

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 33

stateside distributor for Mark's cocaine, and returned the profits to Mark as a part of that role.

Swan argues that the evidence at trial painted a picture of Swan's involvement in drug activity, but that it did not show that he was part of the conspiracy charged in the indictment. He argues that the evidence showed only that Swan had his own alleged drug import business. However, Swan ignores that several accounts tied him to the conspiracy with which he was charged.

The evidence presented at trial was that Swan agreed to deliver cocaine to Isaac on behalf of Mark on at least two occasions. Swan was not portrayed by the evidence a mere seller of cocaine to Isaac. The evidence that Swan transported cocaine as part of a trade between Mark and Isaac, combined with the evidence that Swan returned large quantities of cash to Mark, shows that Swan was part of the larger organization of which Mark was the hub. That organization was described at trial as distributing "Mark's cocaine" from the Virgin Islands to several east coast cities, as charged in the indictment. The evidence was sufficient to support a jury verdict that found Swan guilty of conspiring to possess with the intent to distribute a controlled substance.

A rational jury believing the government's evidence could have found beyond a reasonable doubt that Swan agreed to possess cocaine with intent to distribute it as part of the conspiracy alleged in Count One of the indictment.

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 34

### 4.   Fagan

Fagan joins his codefendants' motions for a judgment of aqcuittal. As such, the Court will review the evidence against Fagan in a light most favorable to the government, to determine if a rational juror could find that Fagan conspired to possess with intent to distribute cocaine.

Isaac testified that after his May 2005, trip to Tortola with Mark and Ells, the men returned to St. Thomas with a bag Isaac knew contained cocaine. He knew the bag contained cocaine because Mark had told him. About mid-way through the trip back, Mark spoke to Fagan on the phone. Upon arriving back at Coki Point, the boat met Fagan. Mark handed Fagan the bag and Fagan took off.

Michael Goldfinger ("Goldfinger"), a special agent with the DEA, also testified. He testified to surveilling Fagan on June 7, 2005 because he had received information regarding a potential drug drop off in the Coki point/ Coral world / American Yacht Harbor area. Goldfinger saw Fagan park at American Yacht harbor in a white mazda, and get out holding a small black puppy and talking on a cell phone, after 6:30 or 7 pm. Fagan appeared to talk on the phone while looking toward a number of docked boats owned by Customs and Boarder Patrol ("CBP"). Then Fagan left American Yacht Harbor and headed toward Coki Point. Goldfinger followed Fagan, who parked in a shopping area on Smith Bay Road near a pet emporium. Fagan went into the store for about five minutes, then got back in his car and continued toward Coki Point.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 35

Soon after, Fagan left the Coki point area at a high rate of speed, and the surveillance was terminated.

Goldfinger received information that Fagan would be going to Coki point to receive cocaine on June 8, 2005, the following day. He again established surveillance. Goldfinger ordered surveillance at several nearby intersections in order to intercept Fagan. Goldfinger saw Fagan go toward Coki Point, then return from the point five or ten minutes later, again at a high rate of speed. Agents followed Fagan, but lost him.

The government also introduced several wiretap phone conversations from Fagan's phone, and other calls on which Fagan's voice had been identified, from phones of fellow coconspirators.

On June 6, 2005, Fagan was recorded having a conversation with an unidentified female about the price of "it" and "bricks" and the profits he could make off of "it". The conversation included the following:

> VF: Once I, once I get connected, and I could get that all the time for like seventeen, you know what I mean, then I wouldn't have to come back down this side. I could stay up there and get things going, you know what I'm saying, shit. I need to ... I could get that shit going up there first cause I'll probably need like Two bricks to Thirty Six up the road, North Carolina.
>
> UKF: Oh yeah.
>
> VF: Yeah. Make me twenty-one, twenty-two. Make me four thou off a one. Four, four maybe eight thou in less than a week. Come back and get two more in a month. Make fucking ahm sixteen thousand every month. If I could make sixteen thousand, we could feed, you know what I'm saying. Plus, I could bust off, get you something, and let you do your little thing, shit. I'm, I'm thinking about the big cheese man.

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 36

. . .

VF: I'll kill for my fuck, and I don't want too much people in my business man. That's another thing man, you know what I'm saying? Let's fuck that middle man and all that shit.

UKF: He straight. I watch him and listen to him sell shit all damn day, big ones, whole ones, half ones. He do it all God damn day. That's how he make his cushion. I don't know what he do. He just come with the little money from what he sell, then he probably look out.

VF: yeah.

(Ex. 12B, 12C.)

Later that day, at 6:40 p.m., Fagan and Mark spoke on the phone. Mark referred to a puppy, and told Fagan to leave it at a particular cage. (Ex. 13B, 13C.)  The jury could have inferred that that puppy was the one Fagan was carrying when he was observed by Goldfinger.

Less than thirty minutes later, Fagan spoke to an unidentified female, told her he was working that night, and that she shouldn't call him too much because his phone was running low on batteries and he had to save his batteries for calls from other people. (14B, 14C.)

At 7:20 p.m. Mark and Fagan spoke. Mark complained about Fagan being slow. Fagan reassured him that "I almost there." (Ex. 15B, 15C.)

A few minutes later, they spoke again:

VF: The blue one ain't there.

GM: The one with the four of them?

VF: The one with the four of them ain't there.

GM: No!

VF: Naw.

GM: Yeah. Fuck that shit man. Alright.

VF: Yeah. What to do with the dog?

GM: Well, I were going tell you give it to Partner when he come

cause he got to go with it.

VF: oh. I going to cool out here awhile though.

(Ex. 16B, 16C.)   The jury likely inferred that this conversation took

place when Fagan went to American Yacht Harbor and looked at the CBP

boats. That was the same time that Goldfinger saw Fagan carrying a

puppy. The call seems to include Fagan telling Mark that a CBP boat

is not there, which alarms Mark.

At 7:28, Fagan called another person:

VF: Hey, aint going to be, aint going to be tomorrow again.

It going to be the next day.


AD: alright.

VF: because them bad boys out on the water meh son.

AD: alright.

VF: yeah. So we can't come across.

AD: well I, well I, you know what it is. I going to just

hold, you check.

VF: yeah.

(Ex. 17B, 17C.)   This phone call implies that Fagan called someone,

after seeing a CBP boat was out on the water, and told him that the

cocaine could not get through that day because of possible

interception.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 38

Later that night, at 10:52, Fagan and Mark spoke again. Mark told Fagan that the next morning he wanted him to "pass and see if it there cause we got to try to figure out if it, if it out the water or if it... or if it out... them man what out. . . . Cause ah. . . cause if ain't there in the morning, that mean it probably out the water." (Ex. 18B, 18C.)  This conversation also seems to relate to Fagan checking on the CBP boats to predict if CBP was patrolling the waters around St. Thomas.

The following day at 4:57 p.m., Mark called Fagan and Fagan told Mark that "that thing were there this morning."  Mark responds "Yeah. I had end up going to check cause when I weren't hearing from you, I went and check." Later in the same call, Mark inquires if Fagan still has the puppy. Then Mark tells Fagan "we going to check it again, probably like 6:30, cause, cause it get dark 7:00. But it ain't, ain't . . . that fuck is a lil thing man I, I were going to tell Partner keep that fuck meh son." (19B, 19C).

At 6:17 p.m. that day Fagan called Mark:

GM: Ahm, yeah, you going want to check on it in a little while.

VF: Alright, walk with the dog, the puppy?

GM: yeah. We going just give it to him to go with one time.

VF: alright.

GM: Amh, cause I want, it does, it does, the weather does change like bout 6, bout 7, you know what I mean. So that's when I want him turn off. He'd be there by 7:15 p.m.

VF: okay.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 39

GM: You could check on it, by 6:45. It will give him enough time to get he stuff together.

VF: Okay.

GM: so call me back so I could call him.

VF: yeah.

GM: Alright.

(Ex. 20B, 20C.)

Then at 6:55 pm. Fagan called Mark and told him that "everything is safe" and that "everything is Okay." To which, Mark responded "[l]et me call he now. I going wait till it get a lil dimmer though." (Ex 21B, 21C.)

Then at 9pm, Mark called Fagan and asked "how much is it?" to which Fagan replied "three". (Ex. 23B, 23C.)

At 9:49, Fagan called Mark:

GM: Yo

VF: Hello

. . .

VF: thirty-one, eight hundred.

. . .

GM: . . . hold on, it were all of them together?

VF: Naw. Thirty one, and the other one, thirty two.

GM: ahh.

VF: yeah. So all of them... I going have to... one of them I going have to . . . you know... make up.

GM: alright.

. . .

GM: that's the fucking block here man. Yeah. So you say one is thirty one? Fucking four more. . .

VF: two of them is thirty one, and one is thirty two and change. Thirty one, eight hundred, thirty one, and thirty and change.

GM: yeah alright man, we'll figure it out in the morning.

VF: but what I go do is ahm, I go make two of them right because I want one of them for my ahm aham I go buy one.

GM: alright.

VF: but I will buy the least and sell the two.

GM: alright.

(Ex. 24B, 24C.)

The following day, on June 8, 2005, at 7:48 a.m. Mark called Fagan.

VF: Hello.

GM: you check that thing already?

VF: Now, I right here by the shop. I right here by the shop now.

GM: Oh, you didn't check it to see?

VF: I by the shop right now.

GM: Yeah, you going check it?

VF: Oh, now? You want me check it now?

GM: yeah, cause he travel in a little while.

VF: alright.

(Ex. 27B, 27C.)

At 8:01 Fagan called Mark and told him "[e]verything safe," to which Mark replied "[a]lright. Alright. I going call him and tell him, and tell him leave now." (Ex. 28B, 28C.)

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 41

At 9:12 p.m. Fagan called Mark and related being followed by the police, and losing them. (Ex. 30B, 30C.)

The government also presented the testimony of Neil Sprauve ("Sprauve"). Sprauve testified that he was in jail with Fagan, and that Fagan told him he went to Coki Point and picked up six kilos of cocaine. Fagan told Sprauve that some police tried to block his way, and he sped up and they moved out of his way. Fagan also told Sprauve that the police followed him, and he evaded them by shutting off his lights, and going to a public housing development on St. Thomas called PMP.

The evidence presented at trial shows that Fagan agreed to pick up cocaine that Mark had delivered to the shores of St. Thomas on at least two ocassions. It also supports the conclusion that Fagan followed Mark's orders to surveil the CBP boats in order to determine when the boats were at dock and when they were out on the water, to minimize the chances that the cocaine coming from Tortola would be intercepted. The calls also show that Fagan, after taking delivery of the cocaine, measured the weight of several bricks of cocaine. Fagan reported to Mark on the amounts and some shortfall in the gross weight. The calls further show that Fagan was going to buy some of the cocaine from Mark in order to sell it himself. The evidence that Fagan and Mark were discussing when a third person could go demonstrates that Fagan knew he was part of a larger organization and not a mere receiver and storer of cocaine. The above evidence is sufficient to support the conclusion that Fagan agreed to possess with

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 42

the intent to distribute a controlled substance, as charged in the indictment.

A rational jury believing the government's evidence could have found beyond a reasonable doubt that Fagan conspired to possess with intent to distribute cocaine. His motion for a judgment of acquittal will be denied.

5.   **Woods**

Isaac testified that in January, 2004, Woods brought 10 kilos of cocaine from St. Thomas to North Carolina. Wright picked Woods up at the airport and brought him to Isaac, in Morrisville, North Carolina. At that time, Isaac paid Wright $500 and Woods $5000.

Isaac described Woods' delivery of the drugs as follows:

Q. And what, if anything, occurred when you arrived back into North Carolina?

A. That month I received some drugs from Mr. Woods.

Q. Did you also have contact with Ms. Alexis Wright?

A. Yes. I instructed her to go and pick him up, pick up Mr. Woods from Charlotte Airport, instructed her to go to the mall in Greensboro.
     And I instructed Mr. Woods to give the bag containing the cocaine to another individual of the organization, and that individual would pay him the $5,000.

( May 25, 2010 Tr. 74: 17-25.)

Isaac also testified that he saw Woods with the other conspirators at the farm, and that they generally used the farm for drug discussions. However, Isaac did not identify a drug trafficking conversation in which Woods participated or the substance of which Woods may have overheard at the farm.

Alexis Wright also testified, and identified Woods. She corroborated Isaac's testimony, and identified Woods as the person she picked up at the airport and took to Isaac.

The June 2005 delivery performed by Woods "was a step in achieving the conspiracy's common goal. . . ." *United States v. Thomas*, 379 Fed. App'x 262, 262 (3d Cir. 2010)(unpublished)(citation and quotation omitted). Isaac's testimony suggests that Woods was aware that he was transporting cocaine from the Virgin Islands to North Carolina, and not some other contraband. Accordingly, the Court finds that there was no deficiency in evidence about Woods' knowledge of the object of the conspiracy.

**B.    Rule 33**

The defendants assert various errors that they argue should result in a new trial, pursuant to Rule 33.

### 1.    Attempted Juror Bribe

Both Swan and Woods assert that the Court's handling of a juror issue warrants a new trial.

During the trial of this matter, a juror apprised the Court that she had been approached by a third party  who attempted to bribe her into voting not guilty. The Court brought the juror before counsel for all parties, asked her to relate what had happened, and asked if she could be impartial. The juror answered that she could. The juror informed the Court that she had told this third party that she would think about the bribery offer. The juror explained that she only said she would think about it to get the third party to go away.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 44

The Court then asked the juror if she had informed anyone else on the jury that she had been approached for an attempted bribe. The juror told the Court that she had told her aunt, who was serving as an alternate juror.

The Court then called the alternate juror (the "aunt") into a closed hearing. The Court asked the aunt what she had been told. She confirmed the juror's version of events. The Court asked if she had told any other juror about the attempted bribery. The aunt said she had not. The Court also asked the aunt if she could be impartial, and she said she could.

Several parties objected to either the juror or her aunt, the alternate, remaining on the jury. Some of the defendants moved for a mistrial. The Court denied the mistrial motions. The Court immediately sequestered the jury for the remainder of the trial. Ultimately, the juror who had been approached by a third party and her aunt were excused. Neither deliberated with the jury panel that convicted the defendants.

Following the conclusion of the instant trial, the third party who approached the juror has been indicted and convicted of bribing a public official. The juror from the instant case was a key witness against the third party. Swan and Woods now argue that the juror's account of the attempted bribery events during the instant trial do not correspond to her explanation of events given at the bribery trial. Swan and Woods also argue that these subsequent events draw into question the juror's assurance that she told no one on the jury

other than her aunt about the attempted bribery. Swan claims that, in all likelihood, the juror told other members of the panel who did deliberate on the verdict, that someone had attempted to bribe her.

Swan and Woods move for a declaration of a mistrial, or a hearing pursuant to *Remmer v. United States,* 347 U.S. 227 (1954). In *Remmer*, "[a]fter the jury had returned its verdict, the petitioner learned for the first time that during the trial a person unnamed had communicated with a certain juror, who afterwards became the jury foreman, and remarked to him that he could profit by bringing in a verdict favorable to the petitioner." 347 U.S. at 228. The juror told the Court, who informed the prosecution, but not the defense. *Id*. The FBI investigated the incident, decided the statement had been made in jest, and nothing more was done. *Id.*

The *Remmer* Court held that there is a presumption of prejudice from a third party's communication with a juror regarding the matter before the jury, but that such a presumption is not conclusive. *Id*. at 229. The Supreme Court ruled that "[t]he trial court should not decide and take final action ex parte on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id*. at 229-30.

In this case, the Court did call the juror, and then separately her aunt, before it, with all the parties present, for an *in camera* interview. This is not a case, such as *Remmer*, in which the defendants

were kept in the dark about the potential juror tampering. They were present when first one juror, then the other, told the Court what had transpired.

Further, the juror and her aunt told the Court, in their separate *in camera* interviews, accounts that were markedly similar. Moreover, the juror and the aunt both indicated that they had not shared information about the attempted bribery with any other juror on the panel. Because there were only two jurors who knew about the attempted bribery, this matter is distinguishable from cases, such as *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993), in which a juror who received a threat told all the other jurors about the phone call. Here, there is no indication that either woman was being dishonest with Court when they said they had told no other jurors. The Court finds that both were credible when, during the *in camera* interview, they said they had told no other juror about the attempted bribery.

What is more, neither the juror nor her aunt actually deliberated on the defendants' guilt or innocence. As such, the Court finds that presumption of prejudice was rebutted. Swan and Woods' motions for a new trial will be denied.

### 2.   Prosecution's Closing

During the testimony of Kevon Isaac, the government introduced a recorded December 1, 2003 telephone conversation between Swan and Kevon. In that call, Swan stated "some day ago I had couple little fowl and thing, um, 'Thrush' ended up with two of them. So I had to drive up there and get the cab from he and dem fuck, you know what

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 47

I mean?"  Kevon testified that "fowl" was code for cocaine and "cab" was code for cash.

Following the defendants' closing arguments, on rebuttal, the government argued that this call confirmed that Isaac was telling the truth about receiving two kilograms of cocaine from Swan in June of 2003. Swan now claims that the government's rebuttal was a due process violation because the prosecutor was deliberately attempting to mislead the jury.

"A prosecutor has a special obligation to see that justice is done, and it is his duty to refrain from improper methods which could produce a wrongful conviction." *Paxos v. Rundle*, No. 72-1122, 1973 U.S. App. LEXIS 9686, at *8 (3d Cir. May 30, 1973). A reviewing court must first decide if the comments a defendant objects to on review were improper. *United States v. Stephens*, 571 F.3d 401, 408 (5th Cir. June 10, 2009) ("First, we assess whether the prosecutor made an improper remark." (quotation and citation omitted)). If a court determines the comment was proper, there is nothing more to review. If a court decides the comment was improper, it applies harmless error review. "The harmless error doctrine requires that the court consider an error in light of the record as a whole, but the standard of review depends on whether the error was constitutional or non-constitutional. . . ." *United States v. Gambone*, 314 F.3d 163, 177 (3d Cir. 2003) (en banc) (citing *United States v. Molina-Guevara*, 96 F.3d 698, 703 (3d Cir. 1996)).

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 48

The distinction between constitutional and non-constitutional error is that constitutional error impacts the trial in a manner that raises doubts about the fairness of the trial. *Marshall v. Hendricks*, 307 F.3d 36, 67 (3d Cir. 2002) ("Improper conduct only becomes constitutional error when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial." (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)). Further,

> non-constitutional error is harmless when it is highly probable that the error did not contribute to the judgment. . . . High probability requires that the court possess a sure conviction that the error did not prejudice the defendant. . . . If the error was constitutional, the court may affirm only if the error is harmless beyond a reasonable doubt.

*Gambone*, 314 F.3d at 177-78 (3d Cir. 2003) (citing *United States v. Molina-Guevara*, 96 F.3d at 703 (quotations omitted)).

Swan argues that an event that took place six months earlier could not be described as "some day ago."  He further argues that since Isaac testified that he did not pay for the two kilograms at the time he picked them up, Swan could not have been discussing those two kilos when he said he received "cab" for the two "fowl."

In this case, the prosecutor was arguing permissible inferences from the evidence when she said that Swan and Kevon were discussing the two kilograms Isaac had testified he picked up from Swan in New York. Whether the phrase "some day ago" could only refer to an event that literally occurred a few days before the phone call, or whether it could refer to something months before hand, was a decision for

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 49

the jury. The jury could easily have determined that the reference simply meant some time ago. Further, while the discrepancy about payment could have drawn into question Isaac's veracity, "[c]redibility determinations are for the jury." *See United States v. Jannotti*, 673 F.2d 578, 598 (3d Cir. 1982). Because the prosecutor was arguing permissible inferences from the evidence, she did not make an improper remark on rebuttal. The Court's analysis need go no further.

Swan's arguments in support of his motion for a new trial are unavailing. The motion will be denied.

### 3.   Admission of Physical Evidence

Woods and Moses, joined by Fagan and Ells, argue that the Court erred in admitting evidence of cocaine seized on September 20, 2003 at the St. Thomas airport. Woods argues that the cocaine was not connected to the conspiracy charged in this case by any of the evidence. Moses argues that the evidence had no probative value, and was admitted in violation of Federal Rules of Evidence 402 and 403. He also argues that the government did not show the chain of custody of the cocaine, and thus the exhibits were not properly authenticated, pursuant to Rule 901.

Don Donovan ("Donovan") testified that he was working at the airport as a ramp agent in September of 2003 when he recovered two bags without tags. Donovan turned the bags over to Transportation Security Administration ("TSA") officials.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 50

Danton Durand ("Durand"), a supervisory officer at TSA, also testified. He said that someone brought him two bags without tags on September 20, 2003. Following the procedure for bags without tags, he ran them through an X-Ray machine. Each bag set off multiple alarms. Durand opened the first bag and saw several tightly sealed bundles inside. Another agent opened the second bag, and Durand saw similar packages inside it. Durand contacted officer Richard Peak ("Peak") of Customs and Border Protection ("CBP"). Durand saw Peak and another customs agent take the bags away.

Peak testified that he found several tightly wrapped, brick shaped objects in the bags he retrieved from TSA. After investigating the contents of the bags, Peak placed the bricks into evidence bags. Through Peak, the government introduced photographs of the bags that contained the brick shaped objects, and photographs of the bricks themselves. Those photographs were exhibits 40A through 40E. After inspecting the luggage, Peak testified that he sealed the bricks in evidence bags marked with a unique seizure identification number, and with his name, which were transported to a secure federal vault on St. Thomas for temporary storage. Thereafter, Peak moved the bags from the vault on St. Thomas to a permanent storage location in Puerto Rico. Peak testified that the sealed envelopes showed no signs of tampering when he moved them to Puerto Rico. Through Peak, the government introduced exhibits 41A through 41C, which were the evidence bags containing the bricks of cocaine.

United States v. Mark
Criminal No. 2006-80
Memorandum Opinion
Page 51

Karen Pye ("Pye"), a forensic chemist with the Drug Enforcement Administration ("DEA"), also testified. The Court admitted Pye's testimony as that of an expert in forensic chemistry. In September of 2003, Pye was on assignment in Puerto Rico. She received the bricks that had been seized at the St. Thomas airport, and tested them. Pye testified at trial that exhibits 41A, 41B, and 41C, the evidence bags containing cocaine, which Peak had previously identified, were the exhibits associated with the lab report she prepared. She determined that the bricks contained over 20 kilograms of cocaine hydrochloride at 87 percent purity. Through Pye, the government also introduced the bricks of cocaine themselves that had been seized at the airport.

Woods and Moses now argue that admission of the photographs and the cocaine itself was error entitling the defendants to a new trial. The thrust of Woods' argument is that the description of events leading up to the cocaine seizure did not correspond to the manner of secreting cocaine through the airport that Springette described. It is true that Springette described a "bag switch" method for getting cocaine through the airport as carry-on luggage, which would not have entailed sending tagged bags, or even untagged bags, through baggage handling.

However, Glenson Isaac testified that while the bag switch method was used in the 1990s, it was not used in the 2000s. Turnbull testified that after cocaine was seized from the St. Thomas to North Carolina route, the conspiracy began using other routes and methods. One of the methods he described involved sending cocaine to the

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 52

Philadelphia and Baltimore area in "the belly of the plane, as opposed to being in carry-on luggage." (May 24, 2010 Tr. 209:15-16.)   Further corroborating the inference that the drugs seized belonged to the instant drug conspiracy, and not some other drug trafficking conspiracy, Isaac testified that in September of 2003 Mark sent some cocaine to another individual. Isaac said that from that load, he was supposed to receive five kilograms. However, Isaac said he did not receive those five kilograms of cocaine because they were seized in the airport. This testimony was sufficient to permit the jury to infer that the cocaine seized that same month by TSA at the St. Thomas airport was cocaine that belonged to the conspiracy charged in this case.

The Court finds little merit to the argument that there was no evidence tying the September 2003 seizure of 20 kilograms of cocaine to this particular conspiracy.

The Court turns to Moses' argument that the Court erred by admitting evidence of the seized cocaine because the government failed to establish a sufficient chain of custody showing the cocaine was the same cocaine seized at the airport. "Physical evidence must be authenticated before it is admitted. Authenticity is elemental to relevance, for 'evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims[.]'" *United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) (quoting *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992)). "The requirement of authentication . . . is

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 53

satisfied by evidence sufficient to support a finding that the matter

in question is what its proponent claims." Fed. R. Evid. 901(a).

> To establish a chain of custody sufficient to make evidence
> admissible, the proponent need only prove a rational basis
> from which to conclude that the evidence is what the party
> claims it to be. . . . In other words, in a criminal case,
> the prosecution must offer sufficient evidence from which
> the trier [of fact] could reasonably believe that an item
> still is what the [government] claims it to be. . . . This
> burden is not a heavy one. . . . We have long rejected the
> proposition that evidence may only be admitted if a
> complete   and   exclusive   chain   of   custody   is
> established. . . . [S]erious gaps may render a chain of
> custody so deficient that exclusion is required, . . . but
> in the ordinary case gaps in the chain go to the weight of
> the evidence, not its admissibility . . . .

*Rawlins*, 606 F.3d at 82-83 (internal quotations and citations

omitted; alterations in original).

In this case, Peak identified photographs of the luggage that

was seized and the bricks that were inside that luggage. He further

identified the bricks of cocaine, which he had secured in evidence

bags containing unique identifiers, and which he had personally

transported from one secure federal vault in St. Thomas to another

federal vault in San Juan. Pye testified that the evidence Peak

identified was the same substance she tested, and on which she based

her report. There was no break in the chain of custody, and Moses'

argument is without merit.[3]

---

[3] Moses points out that Immigration and Customs Enforcement ("ICE") Special
Agent Louis Penn ("Penn") testified that two bags containing cocaine were found
at the St. Thomas airport on September 20, 2003. Penn testified that the bags had
tags, but the tags were suspicious in that they looked as if they had been
manipulated. The tags appeared to have been removed and reapplied.  Penn confirmed
that the photographs the government had introduced depicted the bags he
investigated that day. This testimony was in conflict with that of Durand and
Donovan, who both said they seized bags that had no tags. However, given that Penn's
testimony had no bearing on the chain of custody or the relevance of the evidence,

**4.    Alleged *Brady* and *Giglio* Violations**

**a.    Conversation between Moses and Isaac**

Moses argues that the government failed to disclose the existence of taped conversations between himself and Isaac.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). However, Brady requires only the disclosure of material evidence, that is, evidence that could have affected the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citations omitted).

To prove a *Brady* violation, the defendant must show that (1) the government withheld evidence, (2) the evidence was favorable, either because it was exculpatory or has impeachment value, and (3) the withheld evidence was material. *See Risha*, 445 F.3d 298, 303 (3d Cir. 2006) (applying the three-part Brady test where impeachment evidence was withheld). Failure to show any of the three prongs is fatal to a *Brady* claim. *See United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983).

Moses points to Isaac's testimony at the first trial of this matter, in September 2007, to show that there was a taped conversation. The reference Moses makes in support of his argument

---

this discrepancy does not affect the Court's analysis of whether it erred in admitting the evidence in question.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 55

that the government withheld a taped conversation is the following

testimony.

> Q. You did not want Agent Goldfinger to know about the
> call you made to Kelvin Moses, did you?
>
> A. He have every call I made to Kelvin Moses.
>
> Q. But not this one?
>
> A. Which one are you talking about?

(Sept. 13, 2007 Tr. 150:8-12.)   This interchange does not show that

there is evidence that the government withheld. At most it shows that

Isaac believed that the government had in its possession tapes of

every conversation he had with Moses. Moses has failed to show the

government violated *Brady*, and his motion for a new trial on that basis

will be denied.

### b.    Turnbull and Springette Letters

Fagan and Woods argue that the government's late production of

letters written by witnesses Turnbull and Springette in violation of

the Jencks Act, 18 U.S.C. § 3500, entitle him to a new trial.

> The Jencks Act requires a court, upon motion of the
> defendant and after direct examination of a government
> witness, to order the United States to produce to the
> defense "any statement . . . of the witness in [its]
> possession . . . which relates to the subject matter as to
> which the witness has testified." 18 U.S.C. § 3500(b).
> Leaving aside "statements" which are transcriptions or
> recordings of grand jury testimony, a "statement" within
> the meaning of the Jencks Act is: (1) a written statement
> made by said witness and signed or otherwise adopted or
> approved by him; [or](2) a stenographic, mechanical,
> electrical, or other recording, or a transcription
> thereof, which is a substantially verbatim recital of an
> oral statement made by said witness and recorded
> contemporaneously with making of such oral statement. 18
> U.S.C. § 3500(e).

*United States v. Ramos*, 27 F.3d 65, 69 (3d Cir. 1994). The Jencks Act "requires that the government disclose prior recorded statements of its witnesses that are 'related' to the subject matter of their testimony." *United States v. Hill*, 976 F.2d 132, 139 (3d Cir. 1992).

The Supreme Court has consistently held that the harmless error rule governs violations of the Jencks Act. *Rosenberg v. United States*, 360 U.S. 367 (1959); *Goldberg v. United States*, 425 U.S. 94 (1976); *Campbell v. United States*, 373 U.S. 487 (1963). "The test for harmless error is whether it is highly probable that the error did not contribute to the conviction." *United States v. Zomber*, 299 Fed. App'x 130, 134 (3d Cir. 2008)(unreported). In applying this test to an asserted Jencks violation, "we must analyze the prejudice resulting from the non-disclosure of the [material] in terms of its potential usefulness to the defense." *Hill*, 976 F.2d at 141.

In this case, after both Springette and Turnbull testified, and the witnesses had been excused, the government produced to defense counsel a number of letters written by them. The letters included a few written by Turnbull to the prosecutors in this case at the United States Attorney's Office for the District of the Virgin Islands, a larger number by Turnbull to an attorney at the United States Attorney's Office for the Middle District of North Carolina, and some written by both Turnbull and Springette to a federal agent working on the investigation of this conspiracy in North Carolina.

Fagan and Woods argue that the letters indicate that Turnbull and Springette either had received, or believed they would receive,

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 57

promises about reducing their sentences, in exchange for their

testimony. Significantly, at trial both men denied having received

such promises or expecting reduced sentences in exchange for

testifying. As such, arguably, the letters were impeachment evidence

that the government was obligated to produce following its witnesses'

testimony, pursuant to the Jencks Act and *Giglio v. United States*,

405 U.S. 150, 154 (1972).

Upon receiving notice that Jencks Act materials had not been

produced, the Court ordered briefing from the parties. The parties

timely complied. Thereafter, the Court allowed the defendants to

recall Springette and Turbull so that the witnesses could be cross

examined in light of the letters.  The defense took advantage of the

opportunity to cross examine both Turnbull and Springette in order

to bring to light the potential impeachment value of the letters. As

such, none of the defendants can claim they suffered prejudice from

the late production of the Turnbull and Springette letters. Even

assuming *arguendo* that there was a Jencks Act violation on these

facts, the error was rectified before the end of trial, and was

harmless because both Springette and Turnbull were grilled about the

contents of the letters. Fagan and Woods's motions for a new trial

on this basis will be denied.[5]

---

[5] Undeterred, Fagan and Woods argue that the late production of Turnbull and
Springette's letters was not cured by recalling the witnesses for cross examination
in light of those letters because on cross examination Springette testified that
he wanted to be moved from his current prison location so that he could get medical
treatment for prostate cancer. Fagan and Woods argue that this was pertinent
information because it provided a strong incentive for Springette to testify.
However, the absence of any mention of prostate cancer in the letters undermines
Fagan and Woods's argument. Springette simply made a mention of prostate cancer

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 58

### c. Letters between Turnbull and Isaac

Fagan and Woods also argue that the government possessed letters exchanged between Tunrbull and Isaac that it did not produce, in violation of the Jencks Act.

During the first trial of this ma tter, Turnbull testified that he had engaged in written correspondence with Isaac. (Sept. 10, 2007 Tr. 158:17-20.)  Turnbull also admitted that he had written to Isaac about putting a case together against a particular person related to the instant conspiracy. (*Id.* at 170:1-6.)  Turnbull confirmed this prior testimony in the retrial of this matter. (May 25, 2010 Tr. 10:3-13:8.)

In the retrial of this matter, DEA agent Mark Joseph ("Joseph") testified that he and another agent had come into possession of a letter from Turnbull to Isaac. (May 28, 2010 Tr. 24:9-12, 25:1-7, 26:3-17.)  Joseph seemed to be referring to the same letter that Turnbull had confirmed he wrote. (*Id.*)

Under the Jencks Act, "[i]t does not matter to whom the statement is made. What matters is that the statement relates to the witness's testimony and is in the possession of the government." *Zomber*, 299 Fed. App'x at 134 (citing *Goldberg v. United States*, 425 U.S. 94, 103 (1976)).

In this case, Joseph's testimony shows that the letter from Turnbull to Isaac was in the government's possession at some point.

---

at trial, on cross examination. Even had the letters been turned over immediately after Springette testified, in compliance with the Jencks Act, Fagan and Woods still would have been surprised by Springette's reference to prostate cancer at trial.

Moreover, Turnbull testified that in the letter he discussed implicating someone related to the conspiracy charged in this case. As such, the letter referred to at trial was Jencks Act material, and should have been produced to the defense. According to Woods and Fagan, it was not. That failure to produce the letter constitutes a Jencks Act violation, and the Court must now review whether that error was harmless. *See id.* at 135.

"The test for harmless error is whether it is highly probable that the error did not contribute to conviction. . . . Specifically in the context of the Jencks Act, 'we must analyze the prejudice resulting from the nondisclosure of the [evidence] in terms of its potential usefulness to the defense . . . .'" *Id.* (citing *United States v. Ali*, 493 F.3d 387, 392 n.3 (3d Cir. 2007); quoting *Hill*, 976 F.2d at 141).

Fagan and Woods argue that the letter(s) between Turnbull and Isaac discuss manipulation of evidence and provide insight into the motivations of Isaac and Turnbull for testifying in this case.

Fagan and Woods grossly overstate the importance of the correspondence. Turnbull and Isaac were both cross examined at trial about their possible motivations for cooperating with the government. It is true that lacking this letter in which Turnbull indicates his willingness to "put a case" against someone related to the conspiracy, the defense lacked support for an attack based on Turnbull's willingness to testify against people he knew.

*United States v. Mark*
Criminal No. 2006-80
Memorandum Opinion
Page 60

However, cross examination of Turnbull with the benefit of the letter to Isaac would not have "seeded reasonable doubt in the minds of one or more jurors about the alleged conspiracy[.]" *See Zomber*, 299 Fed. App'x at 136. Turnbull and Isaac clearly demonstrated their willingness to testify against members of the conspiracy by doing just that at the trial. As such, a letter discussing putting a case together against another member of the conspiracy would not have cast any new light on the government's witnesses, and would not have indicated that they were willing to fabricate information. The references to the missing letter in the transcript do not show that either Turnbull or Isaac was considering fabricating a case against anyone. The letter or letters would not have provided such strong useful ammunition for cross examination that the government's failure to produce them entitles the defendants to a new trial. Accordingly, Fagan and Woods's motions for a new trial based on the government's failure to produce the letter or letters will be denied.

## IV. <u>CONCLUSION</u>

For the reasons given above, the Court will grant Ells's motion for a judgment of acquittal. The Court will deny Woods's, Moses', Swan's, and Fagan's motions for judgment of acquittal. The Court will also deny Ells's, Swan's, Moses', Fagan's, and Woods's motions for a new trial. An appropriate order accompanies this memorandum opinion.

S_____
        **CURTIS V. GÓMEZ**
          **Chief Judge**